Okay. Council may proceed where I'm going to be. May I please report Bob Braun, representing Saddleback Valley Community Church, and assisted by Roger Friedman. Initially, I'd like to apologize for my raspy voice, but I took my family to the hockey game last night, and it didn't survive as well as I'd like. You played hockey? I did not play, but I did vocally participate. You must have imbibed in all those cold drinks. I don't think it was the imbibing as much as the encouragement. Well, do your best, or let Mr. Friedman argue. If your voice gets too strained, feel free to swap offers with counsel. Thank you. Your Honor, the primary issue is whether 502b6 of the bankruptcy code covers the tort claims asserted by the church that are based on a breach of obligations that exist, independent of the lease, and would exist if the lease were never executed or rejected. We say independent of the lease. There was no obligation, was there, to remove this pile of stuff as long as the lease was in effect? That's incorrect, Your Honor. That's incorrect? Yes. The salmon gravel permit 77-2, which is cited in the record, requires ---- Let me just ---- I just want to check on something. You're saying that during the term of the lease, the church could have come to the lessee and said, we want that stuff removed immediately? Yes. Salmon gravel permit 77-2 in one of the conditions requires that the waste deposits be periodically removed during the course of the mining operations. And that's ---- I'm sorry. What are you signing? It's the sand and gravel permit that is appended. So what? What that provides. What does that have to do with your client? It materially affects the client, because it gives the client, as the landowner, a cause of action for waste for damages to the reversionary interest prior to the time of lease termination. Well, let's say a landlord finds out that the tenant is committing some sort of illegality on the property. You know, somebody rents an apartment, and the landlord finds out that he's committing copyright infringement inside, just to give you an example. He's looking at unauthorized videos or maybe downloading unauthorized audio files on it. Can the landlord come in and terminate the lease on that basis? Can the landlord say, you must stop your copyright infringement this minute and bring a lawsuit to stop the copyright infringement? If there is a provision in the lease which requires the tenant to obey all laws, then there would be presented an issue whether that constitutes a material breach that would justify lease termination. Or put it another different way, whether the provision in the lease requiring the tenant to observe all laws covers the copyright laws. In other words, That would also be an issue. Yes, Your Honor. All laws. Certainly, the landlord couldn't cancel the lease on the ground that he found out that the tenant had been driving in excess of the speed limit, could he? That's all laws. And that's a law that you can't go more than one. Especially in the apartments, you know. I think, Your Honor, I think Your Honor is correct. I think in order to justify lease termination, there would have to be a violation that affected the landlord's interest in its capacity as a landlord. You tell me that even though the lease says that only at termination do they have to return the property free and clear of encumbrances, nevertheless, the landlord at any time during the term of the lease could tell the lessor that you've got a pile of that junk out there. Get rid of it. That's correct, Your Honor, because the sand and gravel permit that provided the basis for the mine operator to conduct mining operations on this site required that operator to periodically remove the waste deposits on an ongoing basis. Okay. But what does that have to do with the lease? The fact that he's violating his permit, what is in the lease that says you can come in and enforce a permit? The landlord can come in and enforce a permit. There is a provision in the lease that states that the tenant is obligated to obey all laws, regulations, and permits. But I think the two concepts are distinct with respect to the application of 502b6. Where is that provision? Is that Article 9.01? Throughout the term of this lease, El Toro and its cost incentives shall promptly comply with all present and future laws, ordinances, orders, rules, regulations, and requirements of all Federal, State, county, and municipal governments. Is that the provision you're referring to? That's the lease provision, Your Honor. The sand and gravel permit. That's the lease provision. Yes. The sand and gravel permit, 77-2, is found on pages 453 through 456 of the record. Did you understand my question? I apologize? Did you understand my question? Would you restate it? I want to make sure I'm responding. I was asking about the lease. Judge Scriven obviously got it. Okay. You keep harping on the permit. The question is, assuming the permit does what it says it does, okay, and nobody's asked you a question about this. It's another lawyer who likes to give answers that seem helpful, but they're not relevant to the question being asked. Assuming the permit does, in fact, require those things, what is it in the lease that authorizes the landlord to go in and enforce the permit? Article 9.01. Okay. Point me out where. It's on pages 110-111, and it's the language that Judge Friedman quoted, stating that the lease lessee shall comply with all present and future laws, ordinance, regulations, and requirements of all federal, state, county, and municipal governments. Okay. Did you remember my question? As you're looking for language, it's important to keep in mind what I asked you. Now, would you like me to repeat the question? Yes. Do you remember the question, or would you like me to repeat the question? The question is, what is it in the lease that would authorize the landlord to go in and enforce the terms of the permit? Now, understand the question? That would allow the landlord to go in and enforce the terms of the permit. Article 9.01. Go ahead. That requires the tenant to perform all laws. And if there's a material breach. That requires the tenant, but that doesn't say what the landlord's rights are if the tenant doesn't obey that provision. No. But if there is a material breach, then the landlord is entitled under 1161 of the Civil Code to serve a perform or quit notice. And if there's a failure to perform, that provides the basis for a termination of the tenancy, and there is a basis for breach of contract for failing to comply with 9.01. Well, do you remember my question? Well, as I understood it, I've answered it, but apparently the Court. The question is, what in the lease authorizes the landlord to go in and to enforce the terms of the permit? Now, you understand enforce the terms of the permit means? The county can come in and enforce the terms of the permit by saying you will remove the pile of dirt. You understand enforce the terms of the permit? You understand that concept? Yes. Is there anything the landlord can do under the lease or under anything else that would get it to be able to go into court and force the tenant to comply with the terms of the permit, remove the pile of dirt? We understand they can terminate the lease. No doubt about it. You commit a breach. You commit a material breach. You can terminate the lease. But that wasn't my question. Maybe the answer is nothing. I think on a breach of contract basis, it would be unlikely that the landlord could compel through specific performance the requirement that the tenant remove the material. So the answer to my question is nothing. There's nothing in the lease that allows the tenant, the landlord to force the landlord to force the tenant to comply with the terms of the permit. Nothing specifically in the lease. Specifically is that word that lawyers like to use when they haven't got a good answer. There's nothing at all. You're a lawyer in California. Is there any way representing your client you can go into court and force a tenant to remove the pile of dirt because it doesn't comply with the permit, specifically or generally? Only in action for specific performance that would require the finding of a rational perjury. Could you do it? Unlikely. Not impossible, but unlikely. It's clear, isn't it, that what you could do is you could say that is what you have done. You're failing to comply with the permit is a breach, a material breach of a provision of the lease, and therefore I'm canceling the lease for breach. You could do that, couldn't you? Yes. But that wouldn't, that might get rid of the lease, but it wouldn't necessarily get the stuff off the property. That's correct. And then you'd have to say, and now that the lease has been canceled, now I'm going to invoke that provision that says when the term ends, you've got to turn the property back in its original condition. And this is not its original condition, because originally it didn't have that pile out there, but now it has. So when you turn the property back to me, it's got to be without that stuff. That would be one of the alternatives, but not the only one. The landlord, in addition, would have the ability to sue in tort entirely independent of the lease on a cause of action for waste without terminating the lease for damages to its reversionary interest. Yeah, I, counsel, I thought your client's position from the briefs was that you'd have a tort claim, so you might have a damage claim independent of the lease. That's entirely correct. And that's why, in this context, 502B6 does not apply. Yeah, I was surprised why you were fighting so hard to claim this was a remedy under the lease. I thought you were sitting there tying a rope around your neck and trying furiously to kick the chair from under yourself. That certainly wasn't my intent. But I was trying to honestly. You were nevertheless doing a good job. Well, I was trying to honestly answer the Court's question, and I did. But I think the major point that 502B6 turns on is whether it is a claim by a lessor for damages caused by the termination of the lease. Not caused by, resulting from. Resulting from the termination of the lease. And I would say here neither of those two prongs are met. A fair one. But that must be because you say that it didn't take the termination of the lease to impose the obligation to remove that stuff. That's one of the two arguments, Your Honor. The first is that if a ---- Well, let's talk about that in response to Justice Scalia's question. They could have chosen not to terminate the lease, say we want you to continue being a tenant, but we want you to not remove the pile of dirt or pay us damages so you don't get specific performance. But we're going to go to court and say while on the lease you've put this pile of dirt on the property, and that damages us as a landowner. And your claim is that they could maintain that claim while the lease was ongoing. Yes. In fact, that's the definition of waste is it's a damage to a reversionary interest to property that's held by someone other than the owner, such as by a life estate or a lease. And if there has been an unjustified, wrongful damage to the property that decreases its market value, that gives an immediate cause of action for waste. And that cause of action for waste does not depend on a termination of the lease or a termination of the tenant's occupancy rights. In fact, just the reverse, the cause of action for waste is eliminated once the landlord regains possession. The damages then for waste terminate. So it's just the reverse of 502b6. And what is the state authority for that proposition? That you can bring that kind of tort claim without terminating the lease or whatever the state is? We cited on Exhibit 1 to the opening brief the excerpts from Durings which discuss waste. And I'll quote. Although the statutes and common law envision waste primarily as an action by an out-of-possession owner against an offending party in possession, citing Civil Code Section 818 and 840 and California Civil Code of Procedures Section 732. But do you have any California cases addressing the specific question whether while the lease is still in force, you can bring an action, such an action of waste? That's the definition of waste, Your Honor. Waste is not limited to less ores and less seas, is it? No. But it is a cause of action that rests on the premise that the damage occurred to the reversionary interest of the owner, and therefore does not depend on the termination of the wrongdoer's possessory rights. I mean, you say that, but you don't have a case. I have the quote from Durings and the references to the Civil Code sections. That's correct, Your Honor. But that's the definition of waste. You don't have a case. I do not have a case. Okay. Durings is a commentator, right? Yes. If I recall correctly from the days of California. And where do they say that? Inviting your attention to the opening brief. Tab 1. Tab 1, second page. Above the section where it says suggested forms, it's the one, two, third full paragraph starting there. Civil Code section 826? Starting all those statutes and comments with that paragraph. Okay. Continuing over to the paragraph below that. Somebody got a phone or something that's beeping? I think that was my chair, sorry. Oh, I'm sorry. Never mind. It was so lifelike. There we go. Okay. I'm sorry. Which sentence in that paragraph? It starts, although the statutes and common law envision waste primarily as an action by an out-of-possession owner against an offending party in possession. That's the definition of waste. Okay. And point out the part that helps you. I apologize, Your Honor. I didn't hear you. Point out the language that helps you. It is a cause of action by an out-of-possession owner against a party in possession. And it gives the landlord a cause of action for injury to the reversionary interest or an injury to the inheritance. And the significance of that is it's not dependent on the termination of the tenant's occupancy rights, just the reverse. It's based on damage to the reversionary interest during the time period when the tenant or life estate holder is in possession, which is exactly the opposite of what 5. Well, I don't see where that answers the question. An owner of a life estate can't terminate or the person that's a version of the life estate can very well end the life estate, not by any legal means in any event because it continues for the life of the, so they pretty much have to come in while the life estate, while the person is in possession of the life estate. But that doesn't answer the question of if you have a lease, if you have the kind of interest that can be terminated, whether you can choose to continue that interest in force and come in and bring a claim for tort for waste. I mean, I don't know. It just doesn't seem to answer the question. Well, Bob, C. Ray Boats recognized the circumstance where an independent violation of tort obligations gave a cause of action for waste for damage to the premises during the course of the tenancy. Well, let me see if I understand your basic argument on the case. You say that the Subsection 6 does not apply in this case because the damages that you're claiming for the tort of waste do not result from the termination of the lease. That's your basic argument, I take it. That's one of the two, correct. That right of action existed without regard to the termination of the lease. That's correct, Your Honor. And that's your basic contention. That's one of the two basic contentions, yes, Your Honor. I would say the second is that 502b-6 refers to a claim by a lessor, and a fair reading of that statute means a claim by a lessor in its capacity as lessor, and therefore would not apply to a claim by the church seeking damages for breaches of duties that exist entirely independent of the lease. But that isn't how the church has framed its claim, is it? Is it framed as a claim without regard to the lease? Yes. The tort damages for waste and for nuisance and for trespass have all been asserted. The elements of each of those claims were set forth in the opening brief. None of those claims depend on the existence or nonexistence of the leasehold. All of those claims are based on breaches of obligations that exist entirely independent of the lease, and therefore they're not caused by the existence, rejection, or termination of the lease. Okay. I want to hear from the opposing counsel. Good morning, Your Honors. Ronald Van Wert for the Respondent Electoral Materials Company. The BAP's memorandum opinion, which is the subject of this appeal, addresses each and every argument of the appeal in SBCC. It sets forth the policy, reasons for the cap, and what is applicable to this case. As stated by the BAP in its decision at 12, our conclusion is based on the language of the Bankruptcy Code. The interpretations previously given by the panel, importantly, is required by the critical, undisputed facts of this case. The BAP pointed out that the Church in both of those cases So if you've got a circular claim on the property, they dump toxic waste, so they have a gas station there with leaky tanks, they can simply go into bankruptcy, file a voluntary, and get out of all of those damages by forcing termination of the lease. I don't think that's correct, because of a couple of Supreme Court cases dealing with hazardous waste, Your Honor. I think there's liability when there's hazardous material. Why wouldn't this be capped by this? You say, yes, you're liable, but your liability is capped by this provision. I think because There's no conflict. I think if you took the language, but for the Supreme Court days with CERCLA and the hazardous material aspects, which are policy reasons that are different Is that a bankruptcy case? No, I think it's a Supreme Court case. I think it is a Supreme Court case dealing with CERCLA.  It does not deal with the cap, just hazardous material. I don't see why it helps you, or where that argument works. The Supreme Court can say you've got plenty of liability, and by God, you are liable, and you should pay, and the more you should pay, but the bankruptcy court provides a cap. I mean, if you take the BAPS logic, that would, you know, there's no reason why it wouldn't apply to CERCLA as well as to any other claim, or they go and they blow up the building, or they decide to contaminate it with asbestos, or it winds up being contaminated with radioactive waste, you know, all sorts of things that you could do on the property, and then file a voluntary and keep most of your money, and cap your damages by saying it's all contamination of the lease, because all of this gets triggered by the termination of the lease. Pretty neat trick. It doesn't make any sense at all. It does not make any sense in that example, Your Honor. The difference in that case is that if your argument makes sense, you've got to either distinguish the example, or it's got to make sense with the example. That's what hypotheticals are about. The distinction, Your Honor, is that the specific thing that was being conducted by El Toro was the mining of materials, the lease specifically provided that the residue could be stockpiled, and that's in paragraph 10. So you have specifically conduct that was being conducted by El Toro that was specifically permitted and contemplated by the lease. It doesn't talk about you going out and putting hazardous materials. Then you have nothing to worry about. You don't need a cap because there's no liability. If you say it's permitted, then it's permitted, and you don't have to worry about it. Oh, you do have liability, because at the end of the lease, you have to return the property regraded pursuant to the reclamation plan. So while you're operating, you're allowed to stockpile. There's obviously a dispute as to whether you have to remove it even under the permit, but leaving that aside because there is a genuine dispute about that issue, we were allowed to stockpile. It says it specifically in section 10. We were allowed to mine. So all of this residue was indigenous. The clay is indigenous to the area. As part of the mining process, the clay was allowed to be mined. At the end of the lease, that stockpile had to either be removed, as contended by the church, or it had to be spread, which is our contention. But our failure to spread that is actionable under the Bankruptcy Code. They have a claim, Your Honor, for that specific item, for failing to spread or remove the stockpile. I take it you disagree with your opponent's argument that the obligation to remove did not depend on the termination of the lease. You say your obligation to get rid of the stuff only arose once the lease was terminated. Absolutely, Your Honor. There is a small exception for last operations that allows you a four-month period. But, yes, we had an obligation at the end of the lease, and I think that's tresource. We think that's a dispositive case in this case because it specifically dealt with that issue, whether or not the removal of obligations under the lease occurred at the time of the termination or rejection of the lease. It specifically deals with that issue. Now, counsel has said that tresource is irrelevant. It's very relevant because it deals specifically with 365 of the Code, which deals with the ability of the tenant, or the debtor in possession, to reject. That brings into play Section 502g. Let me ask you a somewhat different question about subsection 502.6. Under B-6, Your Honor? Under the bankruptcy provision we're talking about. Yes, Your Honor. Do you make any argument that the cap applies only to rent payments? No, Your Honor. We make no such claim. Because it seems to me you could well so interpret the statute in the light of the legislative history and the fact that the cap is phrased not in terms of dollar amounts or in terms of something else, but in terms of the amount of rent. No. I think all of the concerns of the legislative history says that what Congress was concerned about, apparently, is that somebody who had a huge rent claim could sort of squeeze out all the other creditors and get an advantage. No. I think that's taken care of by the broad-term claim, which I cited recently that Travelers, which is a Supreme Court case. But it's a claim of a lessor for damages resulting from the termination of a lease of real property. If such claim exceeds, and then it goes on. If the claim exceeds, and it's defined in terms of the rent under the lease. Correct. But before you get there, Your Honor, the claim, which under 101 is broadly based, it means any right of payment, as recently stated by the Supreme Court. So you first get to that, what does the claim include? It's any right of payment under basically California law in this case. So it includes tort claims, it includes contract claims, and other kinds. So you first determine under that section, under the term claim, what is the claim of the landlord. That includes even under 1951 of the California. Well, no. It has to result from the termination of the lease. That's right. And it says damages result, a claim, and the damages resulting from the termination of the lease. So you got the claim. And so the damages are all of the landlord's claim resulting from the termination of the lease. That's why tree source is so important, because it says that includes the removal of all obligations because it does not accrue until exactly at the time when you're supposed to turn it back. And they were making the distinction, the Ninth Circuit, between a situation where you have a, whether it's a prepetition claim, but before you get there, you have to determine whether or not that claim was one which arose at the time of the rejection or termination of the lease. That's why, again, tree source is so important for resolving that issue. And, again, it's relevant because once you make that determination under 365 ---- You know, I don't know if tree source helps you at all. Tree source was interpreting the lease terms there, and the lease terms there said you don't have to remove it until the lease is up. No, that's all it said. Let's look at it together. You got it there? Pardon me? You got tree source there? I do have tree source, Your Honor. Okay. Let's take a look at it. I don't read it nearly as broadly as you're claiming it is. What do you rely on, tree source? Well, first starts, Your Honor, Justice Reimer states, we must decide whether obligations under the terms of the lease on the ---- It's helpful if you tell me where you're reading from. This is at 363 Fed Third 994, the first paragraph. 994, okay. Well, you know, 994 is a page on which the case starts. And I only have a caption there and a bunch of stuff added by West. You're right, correct. You're correct, Your Honor. It's 995. Okay. Go ahead. Where are 995? Where are you reading 995? First paragraph of the opinion. Okay. We must decide whether obligations under the terms of a lease on commercial property to remove a concrete slab and restore the premises to their pre-lease condition arose prior to the trustee's rejection of the lease and thus should be treated as administrative expense claim or upon rejection such that the lessor's claims for damages are unsecured. Then it goes on to say, but ---- Okay. What ---- that's a very long sentence, and I have no idea how it helps you or what it is in that sentence that you are ---- that's helping you. But you want to tell me or you want to just go ahead? Yes, sir. Okay. What is it in that sentence that you think helps you? Because it dealt with the issue of whether lease removal obligations and ongoing maintenance obligations arose upon the termination and rejection of the lease. It says under the terms of a lease. Right. It doesn't mean of all leases. It doesn't mean what we're interpreting in a legal obligation. What it's saying, you're interpreting a lease, which is what I read it to say. That's right. And the lease ---- So how does that help you? Because the lease and tree source is almost the same as this. It had regrading obligations. It had the same ---- it had a maintenance obligation, Your Honor. And then it's ---- and then the Court stated that those only arose at the time of the rejection, termination of the lease. By ---- therefore, it was a prepetition. Where do you ---- where are you now reading from? This is at page 998, Your Honor. Okay. Let me make sure it doesn't ---- yes. It says under the terms of the lease, the removal obligations arose upon termination or expiration of the lease. The termination or expiration of the lease occurred when Midway rejected the lease. Consequently, Midway's obligation and K-4's claim did not arise postpetition, prerejection. Therefore, the resulting damage action for Midway's failure to comply with the removal obligation is treated as a prepetition, general unsecured claim for rejection damages, and not as an administrative expense. Okay. So the ---- You notice that in that passage you read, the words upon termination or expiration of the lease is in quotes. I gather that that is a quote from the actual lease. Correct. Okay. Do you have similar language in your language? Yes, Your Honor. That's ---- Would you point me to paragraph 20 of Article 23? Part of what? Article 23, it's at Exhibit 6, page 128. Okay. Let me go back. Okay. And that starts, on the expiration or other termination of lease of this ---- term of this lease, including the surrender pursuant to Section 2201 here and after and Section 2608 here and after, El Toro shall quit and surrender the premises to Lessor in good order and condition as set forth in Section 1005 here and above, free and clear of lettings, subtenancies, and occupancies, and of all liens and encumbrances other than those that have been created by Lessor. Then you go to 10.05, Your Honor. That's a reclamation obligation. 10.05a says ---- I'm sorry. You said 10.05a. I don't know what ---- I'm sorry. Exhibit 6, page 113, Your Honor. Okay. Go ahead. 10.04 what? I don't see an A. The A is the premises shall restore ---- I don't see an A on the 10.04. Are you talking about 10.04? 10.05, Your Honor. Okay. 10.05. I'm sorry. I said 10.04. Okay. Go ahead. The premises shall be restored to as near as practicable at the grade as outlined in El Toro's reclamation plan granted by the County of Orange in 1988 and goes on to say the grading plan consistent with all, and B says consistent with all government standards and requirements for rehabilitation of premises consistent with the conditions of approval including final grade imposed by the Orange County Environmental Management Agency and its approval of tentative track map number 13336 or as said conditions are later amended at the request of less or and with the written consent of El Toro and then C, all settlement ponds and debris deposits will be removed from the premises prior to the termination of the term except the same are necessary to complete El Toro's operations within the term of the lease which remaining ponds and deposits shall be removed no later than four months following the date of termination. All points that were pointed out why this was so important and the critical factors in the BAP decision was because this lease provided specific. Do you remember what we're looking for? We're looking for a language that matches the quoted language in tree size. And you've read a lot of stuff, but what you haven't pointed out to me is language that matches the quoted language in tree size. I think if you. Look at those equivalent. The closest we've come to is in C, 1005C where they say prior to the termination of the term which strikes me as somewhat different than upon termination. It sounds to me like it's prior from the time. Well, you have Article 23 which is on the expiration or termination. All of those things will be compliant with Your Honor. So that is the same language. If you look at page. I don't see the language upon termination. It's one thing to say that by the time you're done with the lease, you will have complied with certain things. There's another thing to say that upon something happening, that's a triggering event, which is what the language they use. Now, maybe it's close enough. I don't know. It says on the expiration or other termination of the term of this lease. This is again back to Article 23. El Toro shall quit and surrender the premises to lesser and good order and condition as set forth in Section 1005. So it adopts 1005. If you look at Tree Source, Your Honor, it says specifically, it says upon termination, this again is 995. This is a language in Tree Source. Upon termination or expiration of the lease, lessee shall remove all fixtures and equipment on the premises and shall with respect to improvements made after March 1, 1977, remove such improvements, footings, floors, foundations, and shall regrade the premises to natural contours after removing all debris and all incidental materials brought into the premises by lessee. Very similar language, Your Honor, had to do the same thing. El Toro had to return the property free of all these lettings, free of the debris, with the minor exception that I mentioned to you. Let me ask you a hypothetical case, somewhat different from this one, and see how you would answer it. Suppose we had this arrangement here, and they were authorized to remove sand, and gravel, etc., etc., and in the middle of the lease, the lessor discovers and writes them a letter saying, we have discovered that in addition to removing all of this stuff, you've been removing a vast amount of zinc from the property, and you have no authority to remove zinc. You can remove the sand and gravel accordingly. We are terminating the lease because you have breached it. Would the cap apply to that claim? Under those circumstances, El Toro goes into the bankruptcy before the actual termination? No. After it's been terminated, El Toro then files goes into bankruptcy. Could it assert the cap as a bar to this claim for the value of the zinc that has been taken out of the property? I think so, Your Honor. I think so, because the termination lease to the bankruptcy, that is specific, they were removing something that arose in connection with the lease, and it's similar to tree source because it deals with maintenance obligations. It says maintenance obligations, even if they're ongoing maintenance obligations, it's at the end of the lease that the landlord is entitled to the property back. So it can be subpar, and they can be in violation of the lease. The problem I have, in my hypothetical, how are the damages, the value of the zinc that was removed from the property, how do they result from the termination of the lease? I don't think that they necessarily result. They didn't result in that situation. If they don't result, then the cap doesn't apply, does it? That's what the statute says. Right. It limits it to damages resulting from the termination of a lease of real property, and it really goes to what was the purpose of Congress in enacting this? What did they want to cap and why? And it seems to me they certainly didn't intend to cap any possible claim. Suppose one of the claims against the lessee was that they were posting obscene billboards on the property, and people said that's a terrible piece of property they're posting. So they cancel the lease for posting obscene billboards. It's hard to see how any damage they suffered in the loss of revenue from renting these obscene billboards would be viewed as damages resulting from the termination of the lease. It doesn't say damages of the lessor. It says damages resulting from the termination of the lease. And there has to be some connection, I would say. Oh, no question. And that's what the BAPT decision said. It says claims of the lessor in 502b6, not claims of the lessor arising resulting from the termination of the lease. So it's the predicate, as Henri Arden said, is that, one, it has to be a claim of the lessor. In your example, it is a claim of the lessor, and it does have to arise out of the termination of the lease, which we think pre-source tells you the answer. In this, under the facts of this case, where, unlike the zinc taking out, what was allowed in this case was the conduct that happened, that is, the stockpile. So, and that's why it's important to recognize, as the BAPT did, that this is unique and special to this case. And the BAPT said in making this decision, we're not saying that there would never be a case where the cap wouldn't apply, but in this case, because it did arise from the termination, specifically from the termination. That is, when El Toro rejected the lease, and it relates back under 502G, back to the time of pre-petition, the day before the petition is filed, and then 502BG 502G says specifically it deals with rejection damages, and then you look to 502B. That's the cap provision. That's specifically in 502G. So then you look to that, and you see, for example, whether the claim arose out, the claim of the lessor for damages arose out of the termination of the lease. And the BAPT goes through in great detail to explain that. And again, as I pointed out, TreeSource says it doesn't matter if there was subpar performance during the lease or whatever. What happens is that when you get back the lease, that's the time of your damages, and that's when your claim accrues. So the claim accrued by the church at the time of termination, it can send all the notices at once. By the way, in your example, it could send a notice that you took out zinc. Then El Toro comes back in and says, we were allowed to, under the contract or under the lease, to take out the zinc. Then you have a dispute that has to be determined by a court, a proper court. What the cap removes is all of that aspect of it. You say any claim of the lessor that rises in connection with the cancellation of the lease or termination of the lease, which TreeSource and all the cases in my circuit say equals rejection, then if it rises out of that, then the cap applies. So in this particular case the cap is removed. Kennedy. I have a very hard time limiting the principle you're announcing. Anything that happens in the lease ban is subject to the cap. I just have difficulty swallowing that. CERCLA, there are all sorts of damages that can be caused to the property due to a leasehold, some of which you don't know. The landlord doesn't know about because he doesn't have access to the property, doesn't bother checking. And say the tenant realizes there is this huge liability, he can go into bankruptcy court and get a file of voluntary. You've got plenty of assets, but you'd rather not use them to fix the property. So you go into bankruptcy court on a voluntary, as was the case here, and you sanitize your liability by subjecting it to the cap. I mean, it's like printing money. It's like being given a press by the treasury to print cash. It just can't be. I think it can't be. It's one of those nice arguments, but it's not going to fly. I think it can't be in that type of case. In this case, El Toro. No, it's not, Your Honor, because Saddleback Valley Community Church knew for years that there was a stockpile and took no action. The prior landlord took no action. This is not an unknowing thing. What action could they have or should they have or were required to take? They could have said you're improperly stockpiling and brought an action and terminated the lease. Well, at that point, you'd have a termination of the lease. You'd have a termination, but you're not into bankruptcy. And secondly, if there was bad faith, bankruptcy court has jurisdiction to determine that it's an improper filing. It can reject the request by the trustee or the debtor's possessions request to reject the lease. It has to be by order of the court. Saddleback Valley Community Church wanted the property back so much, it stipulated to the rejection of the lease. You don't even have to wait for the rejection. I mean, you could just do it right at the time the lease is about to end. It could be in a particular... You know, the lease ends tomorrow, you file for bankruptcy today, and then you've got a termination of the lease, and you've just made yourself all that money for cleanup. The rejection of the lease, Your Honor... No, but you don't answer my question, the termination. Let's say you don't have a rejection. Oh, you do have a rejection. You can state that the reason for the termination of the... You can argue with my question all you want. I'm sorry. But I'm saying, let's say you don't have a termination because you wait until the day before the lease is about to expire, just about to be over, and you go into bankruptcy court, file a voluntary, and then say the lease is terminated. This is a claim that arises upon termination of the lease, and we're subject to the cap. Wouldn't that work? No. Not necessarily, because the court has jurisdiction to take into equitable considerations whether or not to approve the rejection of the lease. And in doing that, it can determine whether or not this is just a ploy, or whether it is, as Congress has stated, the policy behind it is whether to be fair to the other general unsecured creditors. If the church got its claim in its entirety, then the other unsecured creditors would get almost zero, maybe one cent on the dollar because of the size of their claim, which we obviously dispute, Your Honor. So the bankruptcy court has the equitable power to disapprove of the rejection. I think there was a recent case in the Ninth Circuit that discussed that area, because of this equitable power, because it says it's not just a rejection. 365G says the trustee, the debtor in possession, has the right to reject the lease subject to the approval of the court. That's the overview. So if, in fact, there was bad faith, as you suggested, the court would say, we're not going to allow you to reject it, because you're obviously just singling out this person, and it's not based on the policy behind the entire rule. Kennedy. Why isn't the ---- but, you know, in this case, they're going to put it in a difficult choice of saying, well, I don't want to consent to the rejection, even though this tenant is creating all this damage to the property. And the landlord had basically taken the position of saying, no, no, no, I want the lease to continue. I mean, if the landlord wants the property back, and wants the stuff cleared off, he has to eat the cap, right? Yeah. If he wants to reject the lease and get back the property, that was, by the way, the whole reason for it. They said, at one point, as I understand the legislative history, the ---- all the property would belong to the estate, so that the landlord would lose the land, or possibly lose the land. And so they said, okay, under these special circumstances, the landlord gets back the property. It gets back the entire property to the discredit of all the ---- not considering all the other general unsecured creditors. Under this system, the property goes back to the landlord, and it has a claim for whatever amount. So you first determine that claim, whatever it's made up of. Like I said in 1951 of the California Code, it's a civil code, it specifically talks about detriment that's caused resulting from the termination of the lease. That's the language. Well, I think it's a nice tie. I think you got it. Counsel, I have a question for you, counsel. Yes, Your Honor. And maybe I'm misreading this, but I thought that two of the three BAPT members here expressed negative comments about the broad reading of the cap, Judge Brandt and Judge Klein, but thought they were bound by prior interpretation in the McSheridan case. But, you know, Judge Brandt thought the Atlantic precedent and the In re BAPT Sea Ray Boats precedent had a better reading of the cap. Now, I don't think our panel is bound by McSheridan. So why shouldn't we adopt the rule in Atlantic and in In re BAPT Sea Ray Boats? Because, Your Honor, I think it's because it's tree source. And I think that is binding. Tree source said specifically, took the same argument that Atlantic container. Atlantic container said that the maintenance obligations, the subpart treatment did not arise at the termination of the lease. Tree source said no matter what, it does not approve until this time. If you read tree source, it specifically disavows, if you will, or disagrees with the analysis in Bob's and the other case, Best Products case, and also Atlantic container, because it says that the claim does not accrue until the termination of the lease, rejection of the lease. So I do believe you're bound by tree source. You are not bound by In re McSheridan. I agree with Your Honor. I'll take another look at tree source. Thank you. Let me just bring out one thing about what Judge Brent O'Klein did say. He did get concerned in the concurrent opinion about what you have brought to our attention in this oral argument. He says, while I agree that rebranding contractual obligations as torts is not a problem head on as a matter of contract gives pause, in almost any lease, Your Honor, you could argue that when something's not done in that lease, if you do not do something, for example, removing the concrete or regrade, that's going to be considered to be waste and could result in a tort claim. So on any claim, a landlord could avoid the cap by simply saying, even though you were living under the terms of the lease and you weren't able at the end of the lease to do something that you were required under the lease, that's really waste. Because it's always, any time there's a material injury to property, it's going to be waste. So by rebranding a contract claim as a tort claim, then you're going to escape the cap. The church never raised the tort issue through its proof of claim, through its notice, and even in its first counterclaim, its original counterclaim. I'm not sure I understand. How would failure to remove a driveway amount to waste? How could you classify that as waste? I'm sorry? You gave us an example, failure to remove a driveway. Let's say you build a driveway on a property to run your trucks to the certain distance to the road. How does failure to remove that become waste? Well, one, it's a trespass, because we don't disagree with under California law, it's a tort. It's a trespass because you have left the concrete materials on the property when you're supposed to remove it. That's a trespass. That was found by the BAP. We agree with that, by the way. We've never disagreed with, if you leave something afterwards a trespass, so it's a trespass. That's a tort. Waste, it has to be material. Under some circumstances, if it's a residential property and you leave something in there, that could be material injury. So in your example, that might not be material enough to constitute waste, but it is a trespass. It was your example. Pardon? I was using your words. Well, then I spoke. I was talking about where they didn't regrade and presource, and they left this big foundation on the property, which would be a material, in my opinion, material injury to the property. That's just mainly asking for trouble. Okay. I think we've had more than enough time. Thank you. Do you wish to take a minute for rebuttal? Yes, thank you. First, Your Honor, with respect to tresource, tresource dealt with the issue of whether claims that constituted a breach of lease should be considered pre-petition claims where the claimant is an unsecured creditor or post-petition claim where the claimant was entitled to administrative priority. It did not deal with 502b6, and it did not deal with allegations that the claimant had rights as a tort claimant for breaching obligations independent of the lease. Therefore, tresource is not germane to the arguments being raised by the Church. Second, with respect to the public policy arguments and as they apply to NRA Atlantic Container Corp. and the NRA BOBS, CRA Boats, and Continental Claim, every case that has dealt with the issue of whether there was an intentional or intentional breach of lease should be considered pre-petition claims where the claimant is an unsecured creditor or post-petition claim where the claimant was entitled to administrative priority. And third, with respect to the legal harm to the property. The time is up. Do you have something to say? No. I've made my point. With respect to tresource, Your Honor. Can we talk for a minute, just to get the idea out? We'll take a recess, short recess.
judges: Friedman,, Kozinski, Gould